**PACIFIC OIL COMPANY, Appellant,**

v.

**Stewart L. UDALL, Secretary of the Interior of the United States, Appellee.**

No. 9852.

United States Court of Appeals
Tenth Circuit.

Feb. 4, 1969.

Peter H. Holme, Jr., Denver, Colo. (Holme, Roberts & Owen, A. Edgar Benton, and Jeffrey H. Sachs, Denver, Colo., with him on the brief), for appellant.

Clyde O. Martz, Asst. Atty. Gen. (Lawrence M. Henry, U. S. Atty., Roger P. Marquis, Thos. L. McKevitt, and Edmund B. Clark, Attys., Dept. of Justice, Washington, D. C., with him on the brief), for appellee.

Before PHILLIPS, HILL and SETH, Circuit Judges.

SETH, Circuit Judge.

The plaintiff brought this action as the owner of a number of unpatented mining claims against the Secretary of the Interior to set aside his adverse rulings on patent applications it had filed for the claims, and to cause patents to issue. The trial court refused plaintiff relief and this appeal was taken.

The issues concern the Secretary's refusal to consider applications for patent filed in 1952 and 1953 for two groups of oil shale placer claims located in 1918. The Secretary rejected the 1952 and 1953 patent applications and terminated other proceedings in reference to the claims on the ground that they had been declared void by a decision of his predecessor in office in 1933.

The basic issue here concerns the effectiveness of this 1933 disposition of a contest entered against the claims, and concerns also the ex parte exercise of the Secretary's discretion in refusing to reopen the matter with the 1952–53 patent applications.

The record shows that the Wheeler Shale Company filed in the Denver Dis-

trict Land Office in 1926 and 1927 applications for patents of placer claims together with applications to purchase, and made a deposit of the purchase price as then required by statute. These filings, and particularly the application to purchase which was a necessary part of patent procedure, constituted an "entry" or "entries" which initiated the departmental action as to these claims. In January 1929 the Register of the Denver Land Office issued his Notice of Contest against the applications and the claims.

In this contest the Register asserted that the claims which were the subject of the entries were not valid. These "charges" as ultimately expressed were: That the claims were located for the use and benefit of a single named person, and that two of the locators whose names appeared on the certificates were dummy locators.[1] The Register also asserted that as to some of the claims an insufficient amount of patent work had been performed and there was a question of discovery.

The Register, by a notice in July 1932, set a hearing on the contest for September 25, 1932, at Glenwood Springs. It was later continued until October 6, 1932. Upon receiving this Notice the patent applicant and now the contestee responded by a "Statement of Contestee" to the Denver Land Office, dated August 4, 1932, which stated:

"The expense of continuing this contest will be very great because of the number of claims involved [38] and the number and variety of the charges made in the contest notice. This contestee does not have sufficient funds on hand with which to meet the expenses of such a contest; nor can this contestee secure such funds. Contestee has no property which could be used in securing funds except the oil shale claims being contested, and at the present time there is no market for oil shale lands and nothing can be borrowed thereon."

The letter also stated that the contestee had bought the claims some five years after they had been located and it had no connection with the locators and no charge of bad faith had ever been brought against it. The contestee then stated:

"For the reasons herein stated this contestee has not the ability to proceed further with this contest.

"Wherefore, this contestee asks, as to the 38 claims still owned by it, that the Commissioner of the General Land Office shall decide this contest on the record as it stands; and, if such decision is adverse to this contestee, that this contestee be allowed repayment of the purchase price of said 38 claims."

Thereafter, on October 4, 1932, the District Law Officer at Denver filed in the contest proceedings a "Motion For Judgment by Default" (directed to the Commissioner of the General Land Office) which recited the August 4th statement by Wheeler Shale Company, and referred to its request for an "ex parte adjudication of the contest proceedings." The District Law Officer in the Motion stated that the parties do not intend to appear and it thus becomes unnecessary for the Government to put in a "personal appearance" and the "record" could be completed by the formal motion for judgment by default filed with the Special Commissioner before whom the hearing was set. In this same document the Law Officer moved that the failure of the contestees to appear "be taken and considered as an admission of the truth

[1]. Under the statutes in effect at the time no placer location could include more than 20 acres for each person. Also no single placer claim could be made for more than 160 acres for any association of persons. These provisions were taken by the Land Office to mean that no person could upon location have more than a 20-acre interest in a claim. Thus a location made for the benefit of one in the group whereby such person obtained more than a 20-acre interest in the claim was prohibited. The persons whose names were so used to provide the one person with more than a 20-acre interest were "dummy locators."

of said charges, and that judgment by default be entered holding the said applications and each of them, for cancellation, and the said claims, and each of them null and void, subject, however, to the provision that in the event that favorable consideration be accorded the Petition of the Wheeler Shale Company, the judgment be modified in accordance with the determination upon said Petition." [2]

A few days after filing the above Motion, the District Law Officer wrote a memorandum to the Commissioner of the General Land Office in reference to the contests. He there stated that the Motion for Default was made subject to adverse action upon the contestee's petition for ex parte consideration.

The Commissioner in January 1933 advised the contestees that their financial inability to defend the contest was " * * * no warrant for dismissing the adverse proceedings instituted against the entries and the failure to appear on the date set for the hearing and submit testimony controverting the charges preferred against the entries, is taken as an admission of the truth of the charges and mineral entries * * * are hereby canceled and the Victory Nos. 1 to 29, inclusive, and Bitumen Nos. 1 to 17, inclusive, oil shale placer claims are declared to be null and void." The contestees did not appeal from the Commissioner's decision.

The record shows that after the Commissioner's action, the contestees executed a quitclaim deed "in consideration" of a refund of their purchase money deposit. We attach no significance to the execution of this deed as a conveyance although on first impression it would seem important. At the time it was executed and for many years before, it was customary to use quitclaim deeds for the purpose of terminating "entries." This was considered to be an effective method to clear the Land Office records or to show a positive termination of the entry. Often such a termination was regarded as a prerequisite to the refund of money deposited with the entryman's application when it was not perfected. As to mining claims such a transaction and deed were considered to be effective as to the "entry" only and to have no effect on the mining location. We consider the deed here given to have been for this purpose.

No further proceedings were had until 1952 and 1953 when the surviving trustees of the then dissolved Wheeler Shale Company filed applications for patent for the same claims. The Manager of the Colorado Land Office approved (clearlisted) certain of the claims for patent and initiated contest against others but before any further action could be had, the Manager in April 1959 rejected the applications, cancelled the entries, and closed the abortive contest proceedings. This action was taken on the ground that the Department had learned that these claims had been declared void in 1933 (as above described).

An appeal was then taken to the Director of the Bureau of Land Management who affirmed on September 23, 1960, the Manager's action. An appeal was next taken to the Secretary who affirmed in May 1963 the Director's decision.

The record shows that no one during the course of any of the proceedings questioned the truth of the contestee's statement that it was not financially possible for it to appear. The issue is the application of the regulations and the procedure to be taken under such circumstances. The regulations provided, as indicated above, that if the contestee

---

2. The regulations effective at this time, 44 L.D. 572 (1916), Cir. 460, stated that if a contestee fails to appear at the hearing (or fails to ask for a hearing and fails to deny the charges or fails to submit a statement of facts) " * * * such failure * * * will be taken as an admission of the truth of the charges and will obviate the necessity for the Government submitting evidence in support thereof * * *." and the Register or Receiver may proceed with the case with recommendation to the General Land Office.

did not appear at the hearing without showing good cause therefor, it "will be taken as an admission * * *." etc. Thus the "admission of the truth of the charges" upon nonappearance is operative when the nonappearance is without good cause. Presumably if "good cause" is shown, the Government would proceed with its evidence,—the " * * * necessity for the Government submitting evidence in support thereof [the charges] * * *" would not be obviated. Cases were then heard on this basis. See Mountain Boy, Denver 035039 "N" MAS (June 4, 1934), so strongly urged here by the appellant where a nonappearance by reason of financial inability was excused, the case heard on the "record" (including field reports), and some of the patents applied for were ordered issued and other entries and claims were voided (but with an opportunity for additional showings to be made). As a result financial inability was "good cause" in Mountain Boy but not in the case before us. The appellant complains of this as unequal treatment. On its face it may be, or it may be a result we would not agree with, but this is not for us to decide.

It is clear from the record on this appeal that the Law Officer filed the Motion for Default and recommended to the Commissioner that a default order be entered. The Commissioner had the discretionary power to determine whether "good cause" had been demonstrated, he had the issue before him in January 1933 when the proceedings were submitted to him, and he expressly advised the contestee that their financial inability to defend was " *˙ * * no warrant for dismissing the adverse proceedings" and the failure to appear " * * * is taken as an admission of the truth of the charges * * *." This action and recitation by the Commissioner evidences an exercise of his discretion on the matter of "good cause," made the regulation applicable, and when the truth of the contest charges were so "admitted," the cancellation of the entries followed. The fact that the repre-

sentation of financial inability to appear was perfectly true makes no difference in view of the Commissioner's action. He had the power and discretion to act as he did although the representation was correct.

This in our opinion is the pivotal issue of the case, and contrary to appellant's contention the record shows the exercise of discretion by the Commissioner on "good cause," and not by the Law Officer. He may have followed the Law Officer's recommendation but this does not mean, as appellant in effect argues, that the discretion was not his own. It must then follow that the disposition of the entry was effective and appellant's attack upon it by the subsequent filings and proceedings is unavailing.

The appellant complains bitterly about the different treatment afforded in the Mountain Boy proceedings referred to above. Appellant also points out that the Department has in other proceedings patented claims located under the same division of interest agreement among the locators which was here construed to render the claims invalidly located. The appellants make an appealing argument on what they term the "unequal and conflicting treatment of the various claims," and the record does demonstrate a series of apparent inconsistent acts with reference to claims in a status similar to those of appellants, and a series of changes in policy with reference to oil shale claims which are somewhat bewildering. This is however a complaint more of the quality and soundness of departmental administration than it is a matter for judicial remedy. The record here shows as above described that the departmental proceedings with reference to these claims were within the statutes and within regulations which are not challenged. The results may have been wrong, the exercise of discretion may have been wrong, and the decisions here concerned may have been inconsistent with those in other cases, but this is not for this court to decide.

It does not appear necessary to treat at length the secondary issue re-

lating to the discretionary power of the Secretary to reopen the old proceedings upon receiving the 1952–53 applications for patent. As stated above the original cancellation was effective some twenty years before, and this was adequate reason to discontinue the second series of applications in an ex parte manner. The Secretary here in effect refused to invoke his supervisory jurisdiction described in West v. Standard Oil Co., 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265, and considered in Gabbs Exploration Co. v. Udall, 114 U.S.App.D.C. 291, 315 F.2d 37. His subordinates whether or not in ignorance of the old proceedings had considered the 1952–53 applications as new ones, had clearlisted some of the claims, but it was not until the Secretary considered the matter that it was made apparent officially that this was related to the old case on the same claims. The Secretary then refused to reconsider as he might have done under West v. Standard Oil Co., supra. There is no question but that he has the power not to reconsider, and this he exercised in an effective manner when the matter came before *him* for the first time. The Secretary is the one who has this discretion and not his subordinates.

Affirmed.